**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE,**

| | |
|---|---|
| **PITTS ENTERPRISES, INC. DBA DORSEY INTERMODAL,** ) | |
| ) | |
| Plaintiff, ) | **Court No. 24-00030** |
| ) | |
| ) | **Public Version** |
| v. ) | |
| ) | |
| ) | |
| **UNITED STATES, *et al.*,** ) | |
| ) | |
| Defendants, ) | |
| ) | |
| _____) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

| | |
|---|---|
| | **BRIAN M. BOYNTON**<br>**Principal Deputy Assistant Attorney Genera** |
| | **PATRICIA M. McCARTHY**<br>**Director** |
| **OF COUNSEL:** | **L. MISHA PREHEIM**<br>**Assistant Director** |
| **BENJAMIN JUVELIER**<br>**Attorney**<br>**Office of the Chief Counsel**<br>  **For Trade Enforcement & Compliance**<br>**Department of Commerce** | **Kara M. Westercamp**<br>**Senior Trial Counsel**<br>**Commercial Litigation Branch**<br>**Civil Division,**<br>**Department of Justice**<br>**P.O. Box 480, Ben Franklin Station**<br>**Washington, D.C. 20044**<br>**Tel:  (202) 305-7571**<br>**E-mail:   kara.m.westercamp@usdoj.gov** |
| **November 22, 2024** | **Attorneys for Defendant** |

## TABLE OF CONTENTS

**PAGE**

STATEMENT PURSUANT TO RULE 56.2 .................................................................. 1

    I.      Administrative Determination Under Review ....................................... 1

    II,     Issues Presented For Review ................................................................ 2

STATEMENT OF FACTS ........................................................................................... 2

    I.      Regulatory Framework For Scope Rulings ......................................... 2

    II.     The Antidumping And Countervailing Duty Orders ........................... 4

    III.    Commerce's Initiation Of Pitts's Scope Application ............................ 6

    IV.   Commerce's Preliminary Scope Ruling And Case Briefs ..................... 7

    V.     Final Scope Ruling ............................................................................. 8

SUMMARY OF THE ARGUMENT ............................................................................ 11

ARGUMENT .............................................................................................................. 12

    I.      Standard Of Review ............................................................................. 12

    II.     Commerce's Determination That The Orders Cover Completed Chassis from Vietnam with Chinese-Origin Unassembled Subassemblies Is Supported By Substantial Evidence And Otherwise In Accordance With Law ........................... 14

          A.    The Language Of The Orders is Dispositive And Commerce Properly Conducted a Plain Text Analysis Of The Scope ............................................. 14

                1.    The Plain Language Of The Scope Dictates Chassis Components Can Be Subject Merchandise .................................. 16

                2.    While Unnecessary, Additional (k)(1) Sources Support Inclusion Of Unassembled Subassemblies In The Scope ......................................... 20

          B.    Commerce Did Not Need To Conduct A Substantial Transformation Test ........................................... 24

    III.    Commerce Did Not Need To Conduct A Circumvention Analysis ...................... 26

i

III.   Commerce's Imposition Of The Effective Date For Suspension Of
       Liquidation Is Supported By Substantial Evidence And Otherwise
       In Accordance With Law ...................................................................................... 28

IV.    Substantial Evidence Supports Commerce's Determination That
       Duties Should Be Applied To The Value Of The Finished
       Merchandise ........................................................................................................ 30

CONCLUSION ................................................................................................................................30

# TABLE OF AUTHORITIES

**CASES**                                                                                          **PAGE(s)**

*Altx, Inc. v. United States,*
    370 F.3d 1108 (Fed. Cir. 2004) ...................................................................... 13

*Am. Silicon Techs. v. United States,*
    261 F.3d 1371 (Fed. Cir. 2001) ...................................................................... 14

*Bell Supply Co. LLC v. United States,*
    888 F.3d 1222 (Fed. Cir. 2018) ...................................................................... 24

*Bestfoods v. United States,*
    165 F. 3d 1371 (Fed. Cir. 1999) .................................................................... 24

*Broadcom Corp. v. Int'l Trade Comm'n,*
    28 F.4th 240 (Fed. Cir. 2022) ...................................................................... 13

*Corus Staal BV v. United States,*
    502 F. 3d 1370 (Fed. Cir. 2007) .............................................................. 26, 27

*Duferco Steel, Inc. v. United States,*
    296 F.3d 1087 (Fed. Cir. 2002) .................................................................... 14

*E.I. DuPont de Nemours & Company v. United States, 8 F. Supp.*
    8 F. Supp. 854 (Ct. Int'l Trade 1998) ........................................................ 24

*Fedmet Res. Corp. v. United States,*
    755 F.3d 912 (Fed. Cir. 2014) ...................................................................... 13

*Fujitsu Gen. Ltd. v. United States,*
    88 F.3d 1034 (Fed. Cir. 1996) ...................................................................... 14

*Global Commodity Grp. LLC v. United States,*
    709 F.3d 1134 (Fed. Cir. 2013) .............................................................. 13, 31

*King Supply Co. v. United States,*
    674 F.3d 1343 (Fed. Cir. 2012) .................................................................... 13

*Meridian Products, LLC v. United States,*
    851 F.3d 1375 (Fed. Cir. 2017) ............................................................. *passim*

*Mid Continent Nail Corp. v. United States,*
    725 F.3d 1295 (Fed. Cir. 2013) .............................................................. 13, 14

*Nippon Steel Corp. v. United States,*
    219 F. 3d 1348 (Fed. Cir 2000) .................................................................... 27

*Nippon Steel Corp. v. United States,*
   458 F. 3d 1345 (Fed. Cir. 2006) ..................................................... 13

*Novosteel SA v. United States,*
   284 F.3d 1261 (Fed. Cir. 2002) ..................................................... 13

*Paul Muller Industrie GmbH & Co. v. United States,*
   502 F. Supp. 2d 1271 (Ct. Int'l Trade 2007) ............................... 26

*Rhone Poulenc, Inc. v. United States,*
   899 F. 2d 1185 (Fed. Cir. 1990) ..................................................... 26

*Saha Thai Steel Pipe Public Company, Ltd. v. United States,*
   101 F.4th 1310 (Fed. Cir. 2024) ............................................. *passim*

*Sandvik Steel Co. v. United States,*
   164 F.3d 596 (Fed. Cir. 1998) ....................................................... 13

*Sango Int'l L.P. v. United States,*
   484 F.3d 1371 (Fed. Cir. 2007) ....................................................... 4

*Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States,*
   146 F. Supp. 3d 1331 (Ct. Int'l Trade 2016) ............................... 16

*Shenyang Yuanda Aluminum Indus. Eng'g Co., Ltd. v. United States,*
   776 F.3d 1351 (Fed. Cir. 2015) ................................................ 3, 14

*Sunpreme, Inc. v. United States,*
   946 F. 3d 1300 (Fed. Cir. 2020) ................................................... 30

*Tak Fat Trading Co. v. United States,*
   396 F.3d 1378 (Fed. Cir. 2005) ................................................. 4, 14

*Trans Texas Tire LLC v. United States,*
   519 F. Supp. 3d 1275 (Ct. Int'l Trade 2021) ......................... *passim*

*U.K. Carbon and Graphite Co., Ltd. v. United States,*
   931 F. Supp. 2d 1322 (Ct. Int'l Trade 2013) ............................... 27

*United Steel & Fasteners, Inc. v. United States,*
   947 F.3d 794 (Fed. Cir. 2020) ............................................. 2, 3, 13

*Venus Wire Indus. Pvt. Ltd. v. United States,*
   471 F. Supp. 3d 1289 (Ct. Int'l Trade 2020) ............................... 25

*Walgreen Co. v. United States,*
   620 F.3d 1350 (Fed. Cir. 2010) ..................................................... 13

**Statutes**

19 U.S.C. § 1484(a) ................................................................................................ 29

19 U.S.C. § 1673e(a)(2) ............................................................................................ 2

**Regulations**

19 C.F.R. § 351.225 ....................................................................................... *passim*

19 C.F.R. § 351.226 ................................................................................................ 27

**Administrative Decisions**

*Certain Chassis and Subassemblies Thereof from the People's
  Republic of China: Antidumping Duty Order*,
    86 Fed Reg. 36,093 (Dep't of Commerce July 8, 2021).......................................... 4

*Chassis and Subassemblies Thereof from China*,
    87 Fed. Reg. 15,366 (Dep't of Commerce Mar. 18, 2022)...................................... 23

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE

| | | |
|---|---|---|
| PITTS ENTERPRISES, INC. DBA DORSEY INTERMODAL, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Court No. 24-00030 |
| UNITED STATES, | ) ) | Public Version |
| Defendant. | ) ) ) | BPI Removed on Page 17 |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S
<u>MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>**

Pursuant to Rule 56.2 of this Court's rules, defendant, the United States, respectfully submits this response to the motion for judgment upon the agency record filed by plaintiff, Pitts Enterprises, Inc. dba Dorsey Intermodal (Pitts), ECF No. 24.  Pitts challenges the Department of Commerce's (Commerce) 2024 final scope ruling covering finished chassis from Vietnam containing Chinese-origin axle and landing gear components, which found that the merchandise was within the scope of the antidumping duty and countervailing duty orders covering certain chassis and subassemblies thereof (chassis) from the People's Republic of China (China).  We demonstrate below that Commerce's scope ruling is supported by substantial evidence and otherwise in accordance with the law.

<u>STATEMENT PURSUANT TO RULE 56.2</u>

**I.    <u>Administrative Determination Under Review</u>**

The administrative determination under review is *Chassis and Subassemblies from the People's Republic of China: Final Scope Ruling on Pitts Enterprises, Inc. dba Dorsey*

*Intermodal's Axle and Landing Gear Components* (Dep't of Commerce Jan. 10, 2024) (Final Scope Ruling), APPX2623-36.

## II.    Issues Presented For Review

1.    Whether Commerce's final scope ruling, finding that Pitts's finished chassis from Vietnam containing Chinese-origin axle and landing gear components are within the scope of the antidumping duty and countervailing duty orders covering chassis from China, is supported by substantial evidence and otherwise in accordance with law.

2.    Whether Pitts failed to exhaust its administrative remedies with respect to its argument that Commerce should have conducted a circumvention inquiry.

3.    Whether Commerce's suspension of liquidation determination pursuant to 19 C.F.R. § 351.225(l)(1) is supported by substantial evidence and otherwise in accordance with law.

4.    Whether Commerce's determination that antidumping and countervailing duties should apply to the total value of the imported product considered in the scope inquiry is supported by substantial evidence and otherwise in accordance with law.

## STATEMENT OF FACTS

## I.    Regulatory Framework For Scope Rulings

When Commerce publishes an order, it defines the scope of the order by "includ{ing} a description of the subject merchandise, in such detail as {Commerce} deems necessary." 19 U.S.C. § 1673e(a)(2).  Because Commerce often must write scope language in general terms, questions arise as to whether a particular product is included within the scope of an existing order.  *See Meridian Products, LLC v. United States*, 851 F.3d 1375, 1379 (Fed. Cir. 2017). "When issues arise as to whether a product is within the scope of an order, Commerce issues 'scope rulings' that clarify the scope of an order . . . with respect to particular products."  *United*

2

*Steel & Fasteners, Inc. v. United States*, 947 F.3d 794, 799 (Fed. Cir. 2020) (quoting 19 C.F.R. § 351.225(a)).

When Commerce examines whether merchandise is within the scope of an order, it follows the framework and procedures set forth in its regulations. *See* 19 C.F.R. § 351.225; *see also Shenyang Yuanda Aluminum Indus. Eng'g Co., Ltd. v. United States*, 776 F.3d 1351, 1354 (Fed. Cir. 2015) (noting that "{t}here is no specific statutory provision governing the interpretation of the scope of antidumping duty . . . orders."). Specifically, pursuant to 19 C.F.R. § 351.225(k)(1), Commerce "will consider the language of the scope and may make its determination on this basis alone if the language of the scope, including the descriptions of merchandise expressly excluded from the scope, is dispositive." However, at its discretion, Commerce may consider additional primary interpretative sources when conducting its analysis under subsection (k)(1)(i), including "the descriptions of the merchandise contained in the petition," "the descriptions of the merchandise contained in the initial investigation," "previous or concurrent determinations . . . by {Commerce} including prior scope rulings," and determinations by the International Trade Commission "pertaining to the order at issue." *Id.* § 351.225(k)(1)(i) ("the (k)(1) factors"). Commerce may also consider "secondary interpretive sources," such as any other Commerce, International Trade Commission, or U.S. Customs and Border Protection "rulings or determinations, industry usage, dictionaries, and any other relevant record evidence." *Id.* § 351.225(k)(1)(ii). However, the primary sources in subsection (k)(1)(i) will normally govern where there is a conflict between the primary and secondary (k)(1)(ii) sources. *Id.*

If Commerce determines that the descriptions of the merchandise contained in the subsection (k)(1) sources are dispositive, Commerce issues a final scope ruling regarding

whether the product is subject to the order.  *See* 19 C.F.R. § 351.225(e); *Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1382 (Fed. Cir. 2005).  The (k)(1) sources are "dispositive" when they "definitively answer the scope question."  *Sango Int'l L.P. v. United States*, 484 F.3d 1371, 1379 (Fed. Cir. 2007).  Only when the (k)(1) sources are not dispositive will Commerce further consider five factors set forth at 19 C.F.R. § 351.225(k)(2).  Those factors include the product's physical characteristics, the "expectations of the ultimate users," the "ultimate use of the product," the "channels of trade in which the product is sold," and the "manner in which the product is advertised and displayed."  *Id.*

## II.    <u>The Antidumping And Countervailing Duty Orders</u>

In 2021, Commerce published the antidumping duty and countervailing duty orders covering chassis and subassemblies from China.  *See Certain Chassis and Subassemblies Thereof from the People's Republic of China: Antidumping Duty Order*, 86 Fed Reg. 36,093 (Dep't of Commerce July 8, 2021) (AD *Order*); *Certain Chassis and Subassemblies Thereof from the Peoples' Republic of China: Countervailing Duty Order*, 86 Fed. Reg. 24,844 (Dep't of Commerce May 10, 2021) (CVD *Order*) (collectively, *Orders*).  As described in the *Orders*:

> The merchandise covered by the *Orders* consists of chassis and subassemblies thereof, whether finished or unfinished, whether assembled or unassembled, whether coated or uncoated, regardless of the number of axles, for carriage of containers, or other payloads (including self supporting payloads) for road, marine roll-on/roll-off (RORO) and/or rail transport. Chassis are typically, but are not limited to, rectangular framed trailers with a suspension and axle system, wheels and tires, brakes, a lighting and electrical system, a coupling for towing behind a truck tractor, and a locking system or systems to secure the shipping container or containers to the chassis using twistlocks, slide pins or similar attachment devices to engage the corner fittings on the container or other payload.
>
> Subject merchandise includes, but is not limited to, the following subassemblies:
> •      Chassis frames, or sections of chassis frames, including kingpin assemblies, bolsters consisting of transverse beams with locking or support mechanisms, goosenecks, drop assemblies, extension mechanisms and/or rear impact guards;

4

- Running gear assemblies or axle assemblies for connection to the chassis frame, whether fixed in nature or capable of sliding fore and aft or lifting up and lowering down, which may or may not include suspension(s) (mechanical or pneumatic), wheel end components, slack adjusters, axles, brake chambers, locking pins, and tires and wheels;
- Landing gear assemblies, for connection to the chassis frame, capable of supporting the chassis when it is not engaged to a tractor; and
- Assemblies that connect to the chassis frame or a section of the chassis frame, such as, but not limited to, pintle hooks or B-trains (which include a fifth wheel), which are capable of connecting a chassis to a converter dolly or another chassis.

Importation of any of these subassemblies, whether assembled or unassembled, constitutes an unfinished chassis for purposes of these Orders.

Subject merchandise also includes chassis, whether finished or unfinished, entered with or for further assembly with components such as, but not limited to: hub and drum assemblies, brake assemblies (either drum or disc), axles, brake chambers, suspensions and suspension components, wheel end components, landing gear legs, spoke or disc wheels, tires, brake control systems, electrical harnesses and lighting systems.

Processing of finished and unfinished chassis and components such as trimming, cutting, grinding, notching, punching, drilling, painting, coating, staining, finishing, assembly, or any other processing either in the country of manufacture of the in-scope product or in a third country does not remove the product from the scope. Inclusion of other components not identified as comprising the finished or unfinished chassis does not remove the product from the scope.

Individual components entered and sold by themselves are not subject to the Orders, but components entered with or for further assembly with a finished or unfinished chassis are subject merchandise. A finished chassis is ultimately comprised of several different types of subassemblies. Within each subassembly there are numerous components that comprise a given subassembly.

This scope excludes dry van trailers, refrigerated van trailers and flatbed trailers. Dry van trailers are trailers with a wholly enclosed cargo space comprised of fixed sides, nose, floor and roof, with articulated panels (doors) across the rear and occasionally at selected places on the sides, with the cargo space being permanently incorporated in the trailer itself. Refrigerated van trailers are trailers with a wholly enclosed cargo space comprised of fixed sides, nose, floor and roof, with articulated panels (doors) across the rear and occasionally at selected places on the sides, with the cargo space being permanently incorporated in the trailer and being insulated, possessing specific thermal properties intended for use with self-contained refrigeration systems.

Flatbed (or platform) trailers consist of load-carrying main frames and a solid, flat or stepped loading deck or floor permanently incorporated with and supported by frame rails and cross members.

The finished and unfinished chassis subject to these Orders are typically classified in the Harmonized Tariff Schedule of the United States (HTSUS) at subheadings: 8716.39.0090 and 8716.90.5060. Imports of finished and unfinished chassis may also enter under HTSUS subheading 8716.90.5010. While the HTSUS subheadings are provided for convenience and customs purposes, the written description of the merchandise under order is dispositive.

AD *Order* at 36,094; CVD *Order* at 24,845.

## III.    Commerce's Initiation Of Pitts's Scope Application

On December 22, 2022, Pitts submitted an application requesting that Commerce conduct a scope inquiry to determine whether its assembled chassis from Vietnam, constructed from Chinese-origin axle and landing gear components, are included within the scope of the *Orders.* Prelim. Scope Ruling at 1-2, APPX2443-44.  Commerce rejected this first scope application because Pitts did not sufficiently demonstrate how the individual components at issue, *i.e.*, axle and landing gear products from China, were distinct from axle and landing gear subassemblies, which are "clearly" listed as covered by the scope of the *Orders*.  Pitts Scope Application Rejection Letter (Jan. 20, 2023), APPX1020.  In its rejection letter, Commerce requested that certain documents be submitted to U.S. Customs and Border Protection (Customs) as part of a relevant Enforce and Protect Act investigation also involving Pitts.  *Id*.  Pitts resubmitted its scope application, and on March 15, 2023, Commerce initiated the scope inquiry.  Prelim. Scope Ruling at 2, APPX2444.

In its scope ruling request, Pitts described the merchandise subject to the request as a finished chassis from Vietnam, which contains Chinese-origin axle components and landing gear leg components.  *See* Pitts Scope Ruling Request (Feb. 13, 2023), APPX1028.  Specifically, the "chassis" under consideration here are "skeletal rectangular-framed trailers used to transport

shipping containers." *Id*. at Attachment 1, p. 6, APPX1044.  The frames are constructed from an "axle system, wheels and tires, brakes, a lighting and electrical system, a coupling for towing behind a truck tractor, and a locking system" to secure a shipping container of various sizes.  *Id*. Finished chassis also include landing gear systems, made up of legs and other components, which stabilize a portion of the trailer's weight when not attached to a tractor.  *Id*.

After initiating the scope inquiry, Commerce provided an opportunity for interested parties to comment.  *See* Prelim. Scope Ruling at 2, APPX2444.  Commerce received comments from CIMC Intermodal Equipment LLC, dba CIE Manufacturing (CIE), a Chinese chassis exporter, and the Coalition of American Chassis Manufacturers (the Coalition), the petitioner. *Id*.  Commerce also received rebuttal comments from Pitts.  *Id*.

## IV.    Commerce's Preliminary Scope Ruling And Case Briefs

On September 15, 2023, Commerce issued its preliminary scope ruling finding that Pitts's merchandise is covered by the scope of the *Orders*.  *See generally* Prelim. Scope Ruling, Appx2443-52.  In the preliminary scope ruling, Commerce relied on the plain language of the scope to find that the landing gear components (*i.e.*, legs) and axle systems of Chinese origin constitute "unassembled subassemblies" covered by the scope of the *Orders*.  *Id*. at 9, APPX2451.

Commerce received case briefs from four interested parties: Pitts, APPX2489-2530, the Truong Hai Auto Corporation Special Vehicles Manufacturing Limited Company (THACO, Pitts's Vietnamese supplier), APPX2479-88, the Coalition, APPX2531-34, and CIE, APPX2535-58.  Parties raised four primary arguments.  First, THACO, Pitts, and CIE submitted arguments about whether the plain language of the scope is sufficient for Commerce to make a determination, or if Commerce should analyze and rely on the additional (k)(1) sources submitted to the record by Pitts.  Second, all four parties submitted arguments analyzing the

plain text of the scope and whether chassis components, when exported from China to Vietnam for further processing and assembly before being imported into the United States, could be subject merchandise.  Third, Pitts and CIE submitted arguments regarding whether Commerce's suspension of liquidation instructions issued pursuant to 19 C.F.R. § 351.225(l)(1) used the appropriate effective date.  Fourth, Pitts argued that if Commerce continues to find that Pitts's merchandise is in-scope, Commerce should only assess antidumping and countervailing duties on the value of the Chinese components rather than on the value of the finished product.

**V.    <u>Final Scope Ruling</u>**

On January 10, 2024, Commerce published its Final Scope Ruling concluding that Pitts's chassis are covered by the scope of the *Orders*.  Final Scope Ruling at 1, APPX2623.  Commerce explained that, in making this determination, it relied only on the plain language of the scope, which it found to be "dispositive" and therefore did not necessitate turning to the criteria described in 19 C.F.R. § 351.225(k)(1) as supplementary sources of interpretation.  *Id.* at 6, APPX2628.  Further, Commerce explained that the "plain language of the scope states that 'importation of any of these subassemblies, whether assembled or unassembled, constitutes an unfinished chassis for purposes of these *Orders*.'"  *Id.* at 7, APPX2629.  "Thus, THACO's imports of all components for a running gear subassembly, most of the components for a landing gear subassembly, and other chassis components for other subassemblies are considered an unfinished chassis for purposes of these *Orders*."  *Id.*

Commerce found that, by importing chassis components included in the written scope, Pitts's supplier, THACO, imported an unassembled subassembly, which constitutes an unfinished chassis for the purposes of these *Orders*.  *Id.*  Further, while THACO imported the Chinese-origin unfinished chassis into Vietnam, where it performed further processing to finish

the chassis ahead of its importation into the United States by Pitts, such further processing in a third-country is explicitly included within the scope of the *Orders*. *Id*.

Commerce responded to arguments made by the parties using primary sources to further explain the reasoning behind its decision. *Id*. at 7-8, APPX2629-30. To begin with, Commerce explained that "Pitts has misrepresented multiple primary sources" and determined to clarify the sources. *Id.* at 7, APPX2629. Commerce noted that it was the petitioner, the Coalition, who suggested the scope language to include "or for further assembly," and, "on behest of the petitioner, added language to the scope that included individual components as subject merchandise when they were entered with or for further assembly with a finished or unfinished chassis." *Id.* at 7-8, APPX2629-30. Contrary to Pitts's assertion that the International Trade Commission also affirmed that individual components that enter separately are not covered by the scope, Commerce explained that the Commission "concluded that 'only subassemblies and components to be used in chassis, as well as finished chassis themselves, are within scope.'" *Id.* at 8, APPX2630.

As to whether chassis components should be considered subject merchandise, Commerce explained that "{t}he purpose of this language was to ensure that individual chassis components that have other uses outside of chassis and subassemblies would not be considered subject merchandise . . . while also preventing companies from engaging in evasion of the *Orders* by separately entering individual chassis components comprising a subassembly or chassis as non-subject merchandise." *Id.* at 11, APPX2633. Commerce also denied that it had introduced a new term, "key component," and a new definition of "unfinished chassis." *Id.* In its preliminary scope ruling, Commerce had used the terms to "provid{e} a general description of the chassis components at issue." *Id.* And there was no "new definition" of unfinished chassis, because

"{b}y importing chassis components that ultimately make up a complete running gear subassembly, as well as importing most of the components for a landing gear subassembly and additional components for other subassemblies from China, THACO, as outlined by the scope, imported an unassembled subassembly, which constitutes an unfinished chassis for purposes of these *Orders*." *Id.* at 11-12, APPX2633-34.

Commerce next considered whether to adjust the applicable suspension of liquidation date on the products covered by the scope inquiry. *Id*. at 12, APPX2634. Commerce explained that because it did not "redefine" or change the scope of the *Orders*, there was no issue regarding notice that would support the choice of an alternative suspension date. *Id.*; *see also* 19 C.F.R. § 351.225(l)(1) (requiring Commerce to issue instructions to Customs to continue the suspension of liquidation of products which were already suspended prior to the initiation of the scope inquiry). Commerce also analyzed the relevance of *Trans Texas Tire LLC v. United States*, 519 F. Supp. 3d 1275 (Ct. Int'l Trade 2021), and explained that it stands for the proposition that Commerce must provide notice of any potential antidumping or countervailing duty liability that may result to importers. Final Scope Ruling at 12, APPX2634. A failure to do so, for example, by altering the language of the scope of an investigation after the scope has already been published yet without changing the effective date to suspend liquidation, is improper. *Id.* at 13, APPX2635. However, Commerce explained that because Pitts had notice of the text of the *Orders*, and, indeed, was a member of the Coalition that was the petitioner for these *Orders*, the notice requirement was satisfied. *Id*.

Finally, Commerce explained that antidumping and countervailing duties must apply to the total value of the imported product. *Id*. Because the scope of the *Orders* makes it clear in plain language that unassembled subassemblies constitute an unfinished chassis, and that

"processing . . . in a third country does not remove the product from scope," THACO's

processing of Chinese products in Vietnam does "not remove the ultimate product, a finished

assembled Chinese chassis, from the scope of the *Orders*." *Id*.

### SUMMARY OF THE ARGUMENT

Commerce's determination should be sustained because it is supported by substantial

evidence and otherwise lawful. The *Orders* expressly address the importation of subassemblies,

whether assembled or unassembled, and state that such merchandise is subject merchandise.

Commerce relied on the plain text of the *Orders*, pursuant to 19 C.F.R. § 351.225(k)(1). And, as

such, was not required to consider the primary interpretive sources listed in 19 C.F.R.

§ 351.225(k)(1), though it did so to respond to arguments the parties raised concerning certain

sources from the initial investigation and previous scope inquiries under the *Orders*. Even

though such sources were not required under Commerce's finding that the plain text of the

*Orders* was dispositive, the additional interpretive sources confirm Commerce's reading of the

scope.

Additionally, Commerce was not required to conduct either a substantial transformation

analysis or a circumvention inquiry, as Pitts argues. A substantial transformation analysis is a

tool that Commerce "may" use when performing a country-of-origin analysis pursuant to 19

C.F.R. § 351.225(j). Here, Commerce did not need to conduct a substantial transformation

analysis because the plain language of the scope itself resolved any questions about the country

of origin of the finished product.

Further, the Court should not consider Pitts's argument that Commerce should have

conducted a circumvention inquiry because Pitts failed to exhaust its administrative remedies on

this point. In any event, this argument lacks merit because Pitts specifically requested that

Commerce conduct a scope inquiry in this case, which Commerce did. And because Commerce

11

determined the product to be covered by the plain language of the *Orders*, it had no reason to conduct a circumvention inquiry.

Next, Commerce's determination not to apply a later effective date for the suspension of liquidation is also supported by substantial evidence. Under 19 C.F.R. § 351.225, "a scope ruling that a product is covered by the scope of an order is a determination that the product has always been covered by the scope of the order." Pitts's claims about notice are unfounded because the text of the *Orders* has not changed since they were first set during the investigations. Although Commerce may impose an alternative date of suspension under its regulations, and Pitts submitted an application to that effect during the scope inquiry, Commerce will only consider such requests if supported by evidence establishing the appropriateness of that alternative date; Pitts submitted no such evidence but instead relied on a flawed reading of *Trans Texas Tire v. United States*, 519 F. Supp. 3d 1275 (Ct. Int'l Trade 2021).

Finally, Commerce's determination that duties should be applied to the total value of the finished merchandise is also supported by substantial evidence. The plain language of the *Orders*, which Commerce found dispositive, indicates that further processing in a third country does not remove the item from the scope of the *Orders*. Just because THACO added value in Vietnam and "finished" an unfinished chassis, that does not mean that the product is anything other than subject merchandise originating from China.

## ARGUMENT

## I.    Standard Of Review

The Court may review a determination by Commerce as to "whether a particular type of merchandise is within the class or kind of merchandise described in an existing . . . antidumping or countervailing duty order." 19 U.S.C. § 1516a(a)(2)(B)(vi). Specifically with respect to a scope ruling, this Court reviews "Commerce's analysis of the (k)(1) sources against the product

in question" as an issue of fact under the substantial evidence standard.  *United Steel & Fasteners*, 947 F.3d at 799; *see also Meridian Prods.*, 851 F.3d at 1382 (citing *Fedmet Res. Corp. v. United States*, 755 F.3d 912, 919-22 (Fed. Cir. 2014)).  This Court must affirm "a Commerce scope ruling that is supported 'by substantial evidence on the record' and otherwise 'in accordance with law.'"  *Meridian Prods.*, 851 F.3d at 1381 (quoting 19 U.S.C § 1516a(b)(1)(B)(i)); *see United Steel & Fasteners*, 947 F.3d at 799.

Commerce enjoys substantial freedom to interpret and clarify its antidumping orders. *Novosteel SA v. United States*, 284 F.3d 1261, 1269 (Fed. Cir. 2002).  A scope ruling involves "a highly fact-intensive and case-specific determination," *King Supply Co. v. United States*, 674 F.3d 1343, 1345 (Fed. Cir. 2012), and is "particularly within the expertise of {Commerce}." *Sandvik Steel Co. v. United States*, 164 F.3d 596, 600 (Fed. Cir. 1998).  Therefore, this Court "afford{s} 'significant deference to Commerce's interpretation of a scope order,' so long as Commerce's interpretation is not 'contrary to the order's terms' and does not 'change the scope of the order.'"  *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1300 (Fed. Cir. 2013) (quoting *Global Commodity Grp. LLC v. United States*, 709 F.3d 1134, 1138 (Fed. Cir. 2013)). After all, the interpretation of its own orders is "at the very heart of {Commerce's} expertise." *Walgreen Co. v. United States*, 620 F.3d 1350, 1355 (Fed. Cir. 2010).

A party challenging a determination under the substantial evidence standard "has chosen a course with a high barrier to reversal."  *Nippon Steel Corp. v. United States*, 458 F. 3d 1345, 1352 (Fed. Cir. 2006) (quotations omitted).  That is because substantial evidence is "more than a mere scintilla," but "less than the weight of the evidence."  *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (quotations omitted).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Broadcom*

*Corp. v. Int'l Trade Comm'n*, 28 F.4th 240, 249 (Fed. Cir. 2022) (quotations omitted). "Even if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent Commerce's determination from being supported by substantial evidence." *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001) (citing *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1044 (Fed. Cir. 1996)).

**II.    Commerce's Determination That The Orders Cover Completed Chassis From Vietnam With Chinese-Origin Unassembled Subassemblies Is Supported By Substantial Evidence And Otherwise In Accordance With Law**

**A.    The Language Of The Orders Is Dispositive And Commerce Properly Conducted A Plain Text Analysis Of The Scope**

"The language of the order determines the scope of an . . . order." *Tak Fat Trading Co.*, 396 F. 3d at 1382 (citing *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1097 (Fed. Cir. 2002). The (k)(1) factors, such as documents from the petition, the underlying investigation, and any prior scope rulings, can serve as interpretive tools, but they "cannot substitute for the language in the order itself." *Id*. When conducting a scope inquiry, Commerce must begin "with a review of the scope language of the order . . . if the scope language expressly and dispositively resolves whether the subject merchandise falls within or outside of the scope, the scope analysis comes to an end." *Saha Thai Steel Pipe Public Co., Ltd. v. United States*, 101 F.4th 1310, 1324 (Fed. Cir. 2024) (citing *Shenyang Yuanda Aluminum Indus. Eng'g Co., Ltd. v. United States*, 776 F. 3d 1351, 1354 (Fed. Cir. 2015); *Mid Continent Nail Corp.*, 725 F. 3d at 1303).

In accordance with this framework, Commerce's scope inquiry began with an examination of the plain scope language to determine whether it is dispositive such that it is unnecessary to consult other interpretive sources. *See* Final Scope Ruling at 6, APPX2628. Commerce analyzed the plain scope language in both the preliminary and final scope rulings and considered the parties' various arguments. *See* Prelim. Scope Ruling at 9, APPX2451; Final

Scope Ruling at 11, APPX2633.  Commerce identified four sections of the scope that are relevant to the question at issue in Pitts's scope inquiry.  *Id.*

First, Commerce identified that "importation of any . . . subassemblies, *whether assembled or unassembled*, constitutes an unfinished chassis."  Prelim. Scope Ruling at 9, APPX2451 (emphasis added).  Second, Commerce noted that the "processing of finished and unfinished chassis and components . . . in a third country does not remove the product from the scope."  *Id.*  Third, Commerce found that while the axle and landing gear legs were imported as components, the language of the scope states that "individual components entered and sold by themselves are not subject to the investigations, *but* components entered with *or for further assembly with* a finished or unfinished chassis are subject merchandise."  Final Scope Ruling at 11, APPX2633 (emphasis added).  Fourth and finally, Commerce noted that both axles and landing gear legs are "mentioned explicitly in the plain language of the scope" as examples of subassembly components.  *Id.*

Commerce found that THACO imported from China certain components of one or more of the subassemblies to a chassis (*e.g.*, chassis frames, running gear or axle assemblies, or landing gear assemblies).  *Id.* at 7, APPX2629.  These components were entered "for further assembly" into a finished chassis in Vietnam and, therefore, were in-scope and defined as "unfinished chassis" from China.  *Id.*  Additionally, because the scope of the *Orders* provides that third country processing "does not remove the product from the scope," Commerce concluded that the resulting product exported from Vietnam is a finished chassis subject to the *Orders*.  *Id.* at 13, APPX2635.

Pitts arguments challenging Commerce's determination to rely on the plain language of the scope of the *Orders* are meritless, as we explain below.

1.    **The Plain Language Of The Scope Dictates Chassis Components Can Be Subject Merchandise**

Pitts argues that Commerce didn't merely "interpret" the plain language of the scope, but instead "altered" the scope of the *Orders* in a manner that redefines "unassembled subassembly." Pl. Br. at 19-24. Pitts asserts that the scope text must "be read as a whole," and cannot be separated into disjointed sections and analyzed independently. *Id*. at 22. According to Pitts, when read as a whole, the scope does not contemplate treating "Chinese components in separate, independent shipments" as unassembled, unfinished chassis. *Id.* at 20-22. However, as set forth below, this argument lacks merit.

We do not disagree that the scope *is* meant to be read as a whole, *see Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 146 F. Supp. 3d 1331, 1346 (Ct. Int'l Trade 2016), and the understanding of the "ordinary language" in the context of the *Orders* is vital to interpreting the plain language of the scope. *See* Pl. Br. at 22-23. However, unlike the cherry-picked interpretation advanced by Pitts, a plain language interpretation of the scope relies on the *entire* language of the *Orders*, in their proper context. *See, e.g.*, *Meridian Products, LLC v. United States*, 851 F. 3d 1375, 1384-85 (Fed. Cir. 2017) (using other aspects of the aluminum extrusion Orders' scope to confirm Commerce's plain language interpretation of the relevant portion of the scope). If the language is dispositive, then Commerce may make its determination based solely on the language of the scope. *See* 19 C.F.R. § 351.225(k)(1).

As discussed above, Commerce based its determination in the Preliminary and Final Scope Rulings on a comprehensive reading of the plain language of the scope. Prelim. Scope Ruling at 9, APPX2451; Final Scope Ruling at 11, APPX2633. First, both axles and landing gear legs are mentioned explicitly in the scope as examples of components that are used in subassemblies. Prelim. Scope Ruling at 9, APPX2451. THACO imports subassembly

16

components for both an axle assembly and a landing gear assembly from China.  *See* Pitts Suppl.

Questionnaire Resp. (SQR) at Exhibit 1, APPX81080-81092; Prelim. Scope Ruling at 9,

APPX2451.  The imported components include not just the axles and landing gear legs, but also

[ ███████████████████████████████████████████████████████████

███████████████████████████████████████ ].  Pitts SQR at Exhibit 1,

APPX81080-81092.  Of these items, [ ███████████████████████████████████

██████████████████ ] are all identified in the scope as components that are used to create the

covered axle and landing gear subassemblies.  *Id.*; *see also* Final Scope Ruling at 2, APPX2624.

Indeed, only a few "minor components" are imported from another country or are fabricated by

THACO itself in Vietnam.  Prelim. Scope Ruling at 9, APPX2451.  If the Court is to read the

scope in its entire context, then including all of these components in the description of an "axle

assembly," a "running gear assembly," and a "landing gear assembly" shows that such

components, when imported to be assembled together, must be covered by the scope.  *See*

*Meridian Products*, 851 F.3d at 1384 (analyzing the context of the aluminum extrusions scope to

show that the scope unambiguously covered finished goods kits made up of both aluminum

extrusions and non-aluminum fasteners intended to attach those extrusions together).

The scope language further states that: "{i}mportation of any of these subassemblies,

whether assembled or unassembled, constitutes an unfinished chassis for purposes of these

*Orders*."  Final Scope Ruling at 2, APPX2624.  Pitts asserts that its subassembly components

were entered as "separate, independent components" and therefore could not constitute an

"unassembled" subassembly.  According to Pitts, the "common meaning" of unassembled means

that the various components must be physically imported together.  *See* Pl. Br. at 23-24.  But to

"assemble" means "to fit together the parts of" some object, and "unassembled" means,

accordingly, "not connected or put together."  Assemble, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/assemble (last accessed Nov. 19, 2024).  To "assemble" components does not require that such components enter together, as in a kit.  *Id.*  By the plain language of the *Orders*, when the disparate components of a particular subassembly, such as an axle assembly, are collectively imported for the purposes of fitting them together, then they are an "unfinished chassis" under the terms of the scope because they are "unassembled" components for a subassembly.  Commerce explained this in the Preliminary Scope Ruling when it explained that "THACO not purchasing fully assembled subassemblies does not mean that its production of chassis is outside the scope of the *Orders*.  THACO imports Chinese-origin chassis components that constitute an unassembled subassembly which the scope of the *Orders* deems as an unfinished chassis and, therefore, subject merchandise."  Prelim. Scope Ruling at 9, APPX2451.  Importantly, Commerce explained that any conclusion to the contrary would introduce a "significant loophole" in the *Orders* because companies could "import full chassis or subassemblies as separate shipments of components against the petitioner's intent{.}"  Final Scope Ruling at 11, APPX2633.

Commerce also considered the fact that THACO adds value in Vietnam by assembling the unfinished Chinese chassis and found such processing covered by the scope language: "{p}rocessing of finished and unfinished chassis and components such as trimming, cutting, grinding, notching, punching, drilling, painting, coating, staining, finishing, assembly, or any other processing . . . in a third country does not remove the product from the scope."  Final Scope Ruling at 3, APPX2625.  "Inclusion of other components not identified as comprising the finished or unfinished chassis does not remove the product from the scope."  *Id.*  While the scope language includes examples, in basic terms, "process" means (in relevant context) "to subject to

a special process or treatment (as in the course of manufacture . . . . )." Process, Meriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/process (last accessed Nov. 19, 2024). THACO's further processing of the chassis – by welding it, assembling it, and putting it together in its "finished" form – does not fall outside of the definition of "processing," and therefore it does not remove the Chinese chassis from scope. *Id*.

Finally, Commerce's analysis did not – as Pitts contends – "read{} out explicitly exclusionary language from the scope" that purportedly covers its imported components. *See* Pl. Br. at 24. In full, the scope exclusion reads: "Individual components entered and sold by themselves are not subject to the investigations, *but* components entered with or for further assembly with a finished or unfinished chassis are subject merchandise." Final Scope Ruling at 2, APPX2624 (emphasis added). Commerce explained in the Final Scope Ruling that the purpose of this language was to balance the interest in preventing evasion of the *Orders* "by separately entering individual chassis components comprising a subassembly or chassis as non-subject merchandise" against the need to "ensure that individual chassis components that have other uses outside of chassis . . . would not be considered subject merchandise." *Id*. at 11, APPX2633. The chassis components at issue here were not used for purposes other than assembly into a finished chassis, and Pitts offers no record support for anything other than that intended use.

Nonetheless, Pitts argues that Commerce's analysis of this exclusionary language relies on circular reasoning because it requires that the definition of "unfinished chassis" include components which are imported for assembly into covered subassemblies. Pl. Br. at 25-26. However, this is neither circular reasoning nor self-serving interpretation: Commerce merely read the plain language of the scope in its context. The exclusions are two of the final three

paragraphs of the scope (with the final paragraph consisting of the relevant HTSUS subheadings). Final Scope Ruling at 3, APPX2625. By the time the reader has reached the exclusions, the scope has already defined what constitutes a subassembly, whether assembled or unassembled, and what constitutes a Chinese chassis, whether finished or unfinished. *Id.* at 2, APPX2624. The scope first defines a chassis, *i.e.*, they are "typically, but are not limited to, rectangular framed trailers with a suspension and axle system, wheels and tires, brakes, a lighting and electrical system, a coupling for towing behind a truck tractor, and a locking system or systems to secure the shipping container or containers." *Id.* That is not at issue in this litigation. Next, the scope states that subject merchandise "includes, but is not limited to, the following subassemblies" and lists the components that, together, make up axle assemblies and landing gear assemblies. *Id.* The paragraph concludes by defining an "unfinished chassis" as *including* the "{i}mportation of any of these subassemblies, whether assembled or unassembled." *Id.* By the time the reader reaches the exclusion for components imported and sold by themselves, the scope has already defined every term in the sentence which Pitts erroneously argues makes for circular reasoning. *Id.*

Accordingly, Commerce reasonably found that the plain language of the scope is dispositive and that the chassis that Pitts imports are subject merchandise. *Id.* at 2-3, APPX2624-25. Substantial evidence supports Commerce's final scope ruling.

## 2. While Unnecessary, Additional (k)(1) Sources Support That Unassembled Subassemblies Are In The Scope

Next, Pitts claims that by *not* analyzing (k)(1) sources, Commerce improperly performed its plain text analysis. Pl. Br. at 27-28. Specifically, it claims that Commerce had to move beyond the plain scope text and consider (k)(1) sources, which proves that its plain scope interpretation was "faulty." *Id.* This argument misunderstands both Commerce's analysis in the

Final Scope Ruling and the scope inquiry regulations.  Pursuant to 19 C.F.R. § 351.225(k)(1),

Commerce "may make its determination" based solely on the language of the scope itself "if the

language of the scope . . . is dispositive."  There is no provision either requiring or prohibiting

the analysis of additional (k)(1) factors.  *See id.* § 351.225(k)(1)(i) ("the following primary

interpretive sources *may* be taken into account . . . *at the discretion of the Secretary*.") (emphasis

added).  In other words, even if Commerce decides that the plain language of the scope is

dispositive, it may still analyze (k)(1) factors to more effectively explain its decision making or

to address specific party arguments.  *Id*.

    Further, where parties rely on the use of interpretive primary sources in making their

arguments before Commerce at the administrative level, "Commerce cannot arbitrarily ignore

those arguments and evidence on the record."  *Saha Thai*, 101 F.4th at 1326.  In *Saha Thai*,

parties similarly argued that Commerce "impermissibly relied on (k)(1) factors" in the

underlying scope inquiry.  *Id*. at 1325.  The Federal Circuit held that because the parties

themselves were the ones to bring up (k)(1) interpretive materials, Commerce must refer to them

in its reasoning.  *Id*.  "If Commerce were to reject a contrary contention allegedly supported by

the (k)(1) materials, Commerce must adequately explain its reasoning for that rejection."  *Id*.  As

in *Saha Thai,* Commerce properly did so here because it was Pitts itself that first relied on the

preliminary and final scope memoranda from the underlying investigations, the International

Trade Commission final determination, and other scope determinations for these *Orders*.  *See*

Pitts Prelim. Scope Ruling Case Br. at 12-13, APPX2509-10; *see also* Final Scope Ruling at 7-8,

APPX2629-2630.

    Further, Pitts argues that its cited (k)(1) factors support a finding that Commerce's Final

Scope Ruling was not supported by substantial evidence.  Pl. Brief at 28-32.  Pitts relies on four

different documents: (1) a petition supplemental questionnaire, APPX80559-63; (2) the

investigation preliminary scope memorandum, APPX80564-82; (3) the International Trade

Commission final injury determination from the investigation, APPX80174; and (4) a final scope

ruling from the *Trans Texas Tire* proceeding (discussed in the Final Scope Ruling at 8,

Appx2630).  Commerce addressed all of these documents in the Final Scope Ruling, and

explained how they actually support its plain text analysis.  Final Scope Ruling at 7-8,

APPX2629-30.

To begin with, Pitts relies on documents from the early stages of the investigation, when

Commerce was first determining how to clarify the scope language.  *See* Pl. Br. at 28-29.  As

Pitts states, the Coalition (which included Pitts) did indeed respond to Commerce's

questionnaires with the intent that individual components should not be covered by the scope.

Prelim. Scope Determ. (investigation) at 8, APPX80572.  However, the Coalition also agreed to

the specific scope language, discussed *supra*, which provides that such components *are* covered

when they enter "for further assembly with a finished or unfinished chassis."  *Id.* at 10,

APPX80574.  It is apparent that Pitts contests this language only because it disputes the plain

language of the scope as including unassembled subassemblies formed from individual

components.

Similarly, in the International Trade Commission Final Determination, the Commission

also affirmed that individual components which enter separately are not covered by the scope.

International Trade Commission Final Determ. at 14, APPX80174.  However, like Commerce's

Preliminary and Final Scope Determinations in this case, and the final language of the *Orders*,

the International Trade Commission recognized that such an exclusion is dependent upon use:

"{t}hus, only subassemblies and components *to be used in chassis*, as well as finished chassis

themselves, are within the scope." *Id.* (emphasis added). It is undisputed that the components that THACO collectively sourced from China were "to be used" in chassis. Final Scope Ruling at 7, APPX2629.

Finally, Pitts points to the only prior scope inquiry made under these *Orders*, the Trans Texas Tire scope inquiry concerning wheel caps, and argues that it "shows Commerce found individual components entered and sold by themselves not subject." Pl. Br. at 31. This argument, again, lacks context. In the Trans Texas Tire inquiry, Commerce found that the wheel caps at issue were out-of-scope because they were sold to the United States as individual components, *and* they were not used for further assembly into a finished or unfinished chassis. *Chassis and Subassemblies Thereof from China*, 87 Fed. Reg. 15,366 (Dep't of Commerce Mar. 18, 2022), and accompanying Trans Texas Tire Scope Ruling at 7-8. The second half of the finding is just as key as the first and is what distinguishes that case from this one. Here, THACO sourced not just a single component, but *many* different components along with the landing legs and axles. SQR1 at Exhibit 1, APPX81080-92. THACO also imported those components into Vietnam "*to be used in chassis*" construction for further export from Vietnam to the United States. Final Scope Ruling at 8, APPX2630 (emphasis added); *see also* International Trade Commission Final Determination at 14, APPX80174.

Ultimately, Commerce only addressed these supplementary sources of interpretation because the parties raised them as support for their arguments, *see Saha Thai*, 101 F. 4th at 1325, but otherwise did not find these additional sources necessary. Final Scope Ruling at 6-7, APPX2628-29. In addressing the parties' arguments in the underlying proceeding, Commerce found that these sources support, rather than undermine, Commerce's plain language reading of the scope. Substantial evidence supports Commerce's determination. *Id.* at 7-8, APPX2629-30.

B.    **Commerce Did Not Need To Conduct A Substantial Transformation Test**

Pitts also argues that Commerce's reliance on third country processing language in the scope contravened Commerce's regulations and precedent, which require that Commerce conduct a country-of-origin analysis. *See* Pl. Br. at 36-40. According to Pitts, Commerce's determination is unsupported by substantial evidence because it fails to consider evidence that the chassis is substantially transformed through its further processing in Vietnam. *Id.* at 36-37. This is incorrect because Commerce neither conducted nor needed to conduct a substantial transformation analysis of the products involved in this scope inquiry.

Commerce's "substantial transformation" analysis is a means of assessing country of origin of a finished product. *Bell Supply Co. LLC v. United States*, 888 F.3d 1222, 1229 (Fed. Cir. 2018). "{S}ubstantial transformation occurs where, 'as a result of manufacturing or processing steps … {,} the {product} loses its identity and is transformed into a new product having a new name, character, and use.'" *Id.* at 1228 (citing *Bestfoods v. United States*, 165 F. 3d 1371, 1373 (Fed. Cir. 1999)). Both this Court and the Federal Circuit have explained that the "substantial transformation rule provides a yardstick for determining whether the process performed on merchandise in a country are of such significance as to require that the resulting merchandise be considered the product of the country in which the transformation occurred." *Id.* at 1229 (citing *E.I. DuPont de Nemours & Company v. United States*, 8 F. Supp. 854, 858 (Ct. Int'l Trade 1998)). To determine whether a product is transformed, Commerce looks to factors such as (1) the class or kind of merchandise, (2) the product properties, essential component of the merchandise, and intended end use; (3) the nature and sophistication of processing in the country of exportation; (4) the cost of production and/or value added; and (5) the level of investment. *Id.* at 1228-29.

24

Commerce is not required to perform a substantial transformation analysis in all cases where a product originates from a third country. Rather, Commerce uses the test "'only' when the country of origin is at issue." *Venus Wire Indus. Pvt. Ltd. v. United States*, 471 F. Supp. 3d 1289, 1300 (Ct. Int'l Trade 2020). Similarly, pursuant to 19 C.F.R. § 351.225(j)(1), Commerce "may" conduct a country-of-origin analysis (such as a substantial transformation analysis) if it "need{s} to determine the country of origin of the product." And even then, Commerce is not limited to a substantial transformation analysis but instead may apply "any reasonable method." *Id.* (stating that Commerce "*may* conduct a substantial transformation analysis" to determine the country of origin, and outlining the factors Commerce can consider) (emphasis added). In this case, Commerce did not need to determine the country of origin of the product because the parties agreed on the relevant facts, and the scope language itself resolved the issue.

The parties agree that the relevant unassembled subassemblies (*i.e.*, the axles, landing gear legs, and other component parts) are manufactured in China, subsequently imported by THACO to Vietnam, whereupon they are attached to the finished chassis frames. Prelim. Scope Ruling at 9, APPX2451. Additionally, the scope in this case explicitly includes merchandise which is further processed in a third country. Final Scope Ruling at 3, APPX2625 (quoting the scope of the *Orders*: "{p}rocessing of finished and unfinished chassis and components . . . either in the country of manufacture of the in-scope product or in a third country does not remove the product from the scope."). Further, as discussed *supra*, the plain language of the scope of the *Orders* is sufficient for Commerce to make a determination that the merchandise under consideration is within the scope of the *Orders*. Commerce stated as much in the Final Scope Ruling, that "because {it} based {its} analysis on the plain language of the scope of the *Orders* . . . {Commerce} find{s} it unnecessary to analyze the criteria set forth in . . . 19 C.F.R.

25

§ 351.225(j) in order to make a scope determination." Final Scope Ruling at 8, APPX2628.

Therefore, the Court should reject Pitts's argument that Commerce acted contrary to its own

regulations and should have conducted a substantial transformation analysis because Commerce

was not required to conduct a substantial transformation analysis in this case at all.

**III.**    **Commerce Did Not Need To Conduct A Circumvention Analysis**

Pitts argues that a circumvention inquiry is the only vehicle by which Commerce may

expand the scope of an order, and that Commerce was required to conduct that inquiry here

because the scope does not cover chassis from Vietnam.  Pl. Br. at 33-36.

However, the Court should not consider this argument because Pitts failed to raise it

below.  By failing to raise this argument before Commerce, Pitts failed to exhaust its

administrative remedies and is precluded from now making this argument.  *See Corus Staal BV*

*v. United States*, 502 F. 3d 1370, 1379 (Fed. Cir. 2007) (recognizing that the exhaustion

requirement protects administrative agency authority and promotes judicial efficiency).  Indeed,

the Federal Circuit has held that a party's obligation to exhaust its administrative remedies in

proceedings before Commerce applies both to broad issues and arguments related to those issues.

*See Rhone Poulenc, Inc. v. United States*, 899 F. 2d 1185, 1191 (Fed. Cir. 1990) (disagreeing

with contention that courts can consider new arguments so long as the general issue was raised at

the agency level); *Paul Muller Industrie GmbH & Co. v. United States*, 502 F. Supp. 2d 1271,

1275 (Ct. Int'l Trade 2007) (holding that when a party raises a general issue but fails to

incorporate a specific argument among other arguments that relate to the same issue, it fails to

exhaust administrative remedies with respect to that argument).  Exceptions to the exhaustion

requirement are limited, and the Court "generally takes a 'strict view' of the requirement that

parties exhaust their administrative remedies before the Department of Commerce in trade

cases." *Corus Staal BV*, 502 F. 3d at 1379.   No exceptions to the exhaustion doctrine apply in this case.

In any event, Pitts's argument is meritless.  Pitts specifically requested that Commerce conduct a scope inquiry in this case and Commerce initiated and conducted a scope inquiry pursuant to 19 C.F.R. § 351.225.  At no point did Pitts request or otherwise argue that Commerce should have *instead* conducted a circumvention inquiry under 19 C.F.R. § 351.226.  *See, e.g.*, Pitts Prelim. Scope Ruling Case Br., APPX2489-2530; Pitts Reply to Pre-Initiation Scope Comments, APPX1923-92; Pitts Reply to Scope Comments, APPX2165-2252.  "The Court may only review the underlying proceeding that Commerce chose to conduct," which is the scope inquiry in this case, and any analysis of the factors relevant to a different type of proceeding "is extraneous."  *U.K. Carbon and Graphite Co., Ltd. v. United States*, 931 F. Supp. 2d 1322, 1328 (Ct. Int'l Trade 2013) (determining that, where a proceeding could have been handled under either circumvention or scope proceedings, but where Commerce chose to analyze the inquiry using the circumvention statute, that analysis of the scope factors is irrelevant because that was not included in the underlying proceeding).

Moreover, Commerce did not need to conduct a circumvention inquiry in this case because the scope expressly covered the product at issue in the scope inquiry.  Final Scope Ruling at 6-7, APPX2628-29.  Circumvention inquiries, by their nature, only apply to products *outside* the scope of an order.  *See, e.g.*, *Nippon Steel Corp. v. United States*, 219 F. 3d 1348, 1356-57 (Fed. Cir 2000) (discussing the differences between circumvention inquiries and scope

inquiries and stating that circumvention inquiries exist for products that are not in the literal text of the scope).[1]  Thus, even if the Court considers this argument, it lacks merit.

## IV.    Commerce's Imposition Of The Effective Date For Suspension Of Liquidation Is Supported By Substantial Evidence And Otherwise In Accordance With Law

Pitts argues that Commerce impermissibly imposed antidumping and countervailing duties on the merchandise under consideration by declining to set the effective date of cash deposits as the date of the preliminary scope determination.  Pl. Br. at 40.  It argues that a later effective date was warranted because Commerce did not give appropriate notice regarding the "change in scope coverage," and the Court has expressly rejected such actions in the past.  *Id*. (citing *Trans Texas Tire, LLC v. United States*, 519 F. Supp. 3d 1275 (Ct. Int'l Trade 2021), and the subsequent history of *Trans Texas Tire* following Commerce's remands).  To support its assertion that Commerce "changed" the meaning of the scope, Pitts cites the Coalition's participation in the underlying proceeding, and the fact that the Coalition reached the opposite conclusion and argued before Commerce in favor of Pitts's proposed interpretation of the scope. *Id*. at 43-44.

As an initial matter, Commerce followed its regulations in this case.  Pursuant to 19 C.F.R. § 351.225(l)(1), when Commerce initiates a scope inquiry, it will direct Customs to "continue the suspension of liquidation of entries of products subject to the scope inquiry that were already subject to the suspension of liquidation, and to apply the cash deposit rate that would be applicable if the product were determined to be covered by the scope of the order." Such suspension of liquidation continues in the event of preliminary or final scope rulings

---

[1] Pitts argues that the inquiry must necessarily be interpreted as a circumvention inquiry because Commerce allegedly "expanded" the scope of the *Orders*.  Pl. Br. at 33.  Such an argument relies solely on the erroneous belief that that the merchandise under consideration is *not* lawfully covered by the scope of the *Orders* which, as we discuss *supra*, is wrong.

finding the product in question to be in-scope.  *See id.* § 351.225(l)(2)-(3).  Commerce

appropriately followed that framework here.  *See* Final Scope Ruling at 12, APPX2634.

Pitts argues that Commerce may impose an "alternative, prospective" date of suspension

under its regulations at 19 C.F.R. § 351.225(l)(3)(iii)(B), Pl. Br. at 41, but as Commerce

explained, "this exception may only be considered if a specific argument is supported by

evidence establishing the appropriateness of that alternative date which Pitts has not done."

Final Scope Ruling at 12, APPX2634.  Indeed, Pitts's argument relies solely on a flawed

interpretation of this Court's holding in *Trans Texas Tire, LLC v. United States*, 519 F. Supp. 3d

1275 (Ct. Int'l Trade 2021).  In particular, Pitts cites *Trans Texas Tire* for the proposition that the

retroactive imposition of duties was contrary to statute due to the lack of adequate notice of a

change in scope coverage.  Pl. Br. at 40-41.

However, *Trans Texas Tire*'s determination was in the context of an *investigation*, not a

scope inquiry.  *Trans Texas Tire*, 519 F. Supp. 3d at 1279-80.  In an investigation, there is no

pre-established scope language until the final determination.  The scope remains fluid, and part

of the purpose of the investigation is to determine what exactly should be covered by any

resulting order should both Commerce and the International Trade Commission issue affirmative

final determinations.  As such, the notice for importers is likewise different, because no

potentially interested party knows of Commerce's reasoning on the issue of scope until the

publication of the preliminary determination.  Here, in contrast, the *Orders* are public

knowledge, and the scope language is established.  *See Orders*.  Publication in the *Federal

Register* is well established as sufficient for giving notice to importers of any liability under an

order, and indeed importers are obligated to use "reasonable care" in assessing whether an order

may cover their imported merchandise.  *See* 19 U.S.C. § 1484(a) (holding importers of record

responsible for providing information that enables Customs to properly assess duties on merchandise).

In this case, Pitts was one of the Coalition members to first file the Petition with Commerce. They cannot claim to be ignorant of the language of the scope. Additionally, Customs "may suspend liquidation of goods" when there is a question as to whether such goods are entered correctly and covered by any antidumping or countervailing duty orders. *See Sunpreme, Inc. v. United States*, 946 F. 3d 1300, 1321 (Fed. Cir. 2020). If Customs has already suspended the liquidation of any potentially subject goods by the time Commerce initiates a scope inquiry, then Commerce is obligated by regulation to order the "continuation" of suspension of liquidation. 19 C.F.R. § 351.225(l)(1); *see* Commerce Instructions to Customs, APPX1995-97 (stating that Customs should "continue" the suspension of liquidation for merchandise subject to the scope inquiry).

Finally, regardless of whether an alternative suspension of liquidation date would have been warranted under 19 C.F.R. § 351.225(l)(3)(iii)(B), there is no basis for the Court to hold – as Pitts requests – that entries prior to the preliminary scope determination date "are outside of the scope." Pl. Br. at 44. "{A} scope ruling that a product is covered by the scope of an order is a determination that the product has always been covered by the scope of the order." 19 C.F.R. § 351.225(a). Therefore, Pitts's product has always been subject merchandise, regardless of when Commerce chooses to impose suspension of liquidation requirements under its regulations. *See* Final Scope Ruling at 12-13, APPX2634-35.

## V. Substantial Evidence Supports Commerce's Determination That Duties Should Be Applied To The Value Of The Finished Merchandise

Pitts argues that, even if Commerce's scope determination is sustained, then the antidumping and countervailing duties should not apply to the full value of the merchandise

30

because a portion of that product is manufactured in Vietnam. Pl. Br. at 44. This ignores the plain text of the scope, which states, in relevant part, "{p}rocessing of finished and unfinished chassis and components, such as trimming, cutting, grinding, notching, punching, drilling, painting, coating, staining, finishing, assembly, or *any other processing* either in the country of manufacture of the in-scope product or in a third country does not remove the product from the scope. *Inclusion of other components not identified as comprising the finished or unfinished chassis does not remove the product from the scope*." Final Scope Ruling at 2, APPX2624 (emphasis added). In other words, just because there is value added to the subject chassis from China while it undergoes further processing in Vietnam, that does *not* mean that the finished product is anything other than subject merchandise. *Id*. at 13, APPX2635. Although Pitts argues that Commerce allegedly "failed to account for" certain other components produced in Vietnam, the text of the scope itself already accounts for those concerns. Pl. Br. at 45. Thus, the plain language of the scope covers the total value of the product. *See* Final Scope Ruling at 13, APPX2635.

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain Commerce's final scope ruling.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

/s/ Kara M. Westercamp
KARA M. WESTERCAMP
OF COUNSEL:                              Senior Trial Counsel
                                         Commercial Litigation Branch
BENJAMIN JUVELIER                        Civil Division
Attorney                                 Department of Justice
Office of the Chief Counsel              P.O. Box 480
  For Trade Enforcement & Compliance     Ben Franklin Station
Department of Commerce                   Washington D.C.  20044
                                         Tel:  (202) 305-7571
                                         E-mail:  kara.m.westercamp@usdoj.gov

November 22, 2024                        Attorneys for Defendant

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the Rules of this Court, the Court's Standard Chamber Procedures, and the Court's scheduling order in that it contains 9,454 words, including text, footnotes, and headings.

/s/Kara M. Westercamp
 KARA M. WESTERCAMP

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE

| | | |
|---|---|---|
| PITTS ENTERPRISES, INC. DBA DORSEY INTERMODAL, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Court No. 24-00030 |
| UNITED STATES, | ) ) | |
| Defendant. | ) ) ) | |

## **ORDER**

     Upon consideration of plaintiff's motion for judgment on the agency record, response thereto, reply, and upon consideration of other papers and proceedings had herein, it is hereby:

     ORDERED that plaintiff's motion is denied;

     ORDERED that the Department of Commerce's determination is sustained in all respects.

Dated: _____, 2024         _____
      New York, New York                                      JUDGE